UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Kristen McDonald,
individually and on behalf of
a class of others similarly situated

       Plaintiffs,

    v.

Franklin County, Ohio,

       Defendant.

Case No. 2:13-cv-503

Judge Michael H. Watson

Magistrate Judge Vascura

## OPINION AND ORDER

Plaintiff Kristen McDonald ("Plaintiff") moves, on behalf of herself and the certified class, for partial[1] summary judgment, a declaratory judgment, and a permanent injunction against Defendant Franklin County, Ohio ("Defendant"). ECF No. 163.  Defendant, likewise, moves for summary judgment against Plaintiff on all of her individual and class claims.  ECF No. 162.  Defendant also moves to strike or exclude the report and declaration of Plaintiff's expert, Arthur Wallenstein.  ECF No. 172.  For the following reasons, Plaintiff's motion for partial summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and Defendant's motion to strike or exclude is **DENIED AS MOOT**.

---

[1] While Plaintiff does not explicitly state that her motion is only for summary judgment on a portion of her claims, as will be discussed below, Plaintiff's arguments only relate to her Photography Class claims and not her individual strip search claim.

# I. PROCEDURAL BACKGROUND

A brief discussion of the procedural background of this case is useful to frame the current motions for summary judgment.  Plaintiff filed her complaint on May 23, 2013, and subsequently amended the complaint on September 30, 2013.  As will be described in greater detail below, the Amended Complaint asserts that Defendant's procedures for admitting detainees to the Franklin County Corrections Center at Jackson Pike ("Jackson Pike"), which typically houses female detainees, are unconstitutional under the Fourth and Fourteenth Amendments.  Plaintiff objects to the following two specific policies.  First, Defendant requires all detainees to disrobe to their underclothes, remove their brassiere if it contains an underwire, and remove their piercings while being observed by a corrections deputy.  Second, Defendant photographs all tattoos on detainees, including tattoos on a detainee's private areas.

Plaintiff sought certification of three classes: a "strip search class," a "photography subclass," and a "cross-gender photography subclass."  The Court certified the photography class pursuant to Rule 23(b)(2) and Rule 23(b)(3).  Plaintiff is therefore permitted to seek both injunctive and monetary relief on behalf of the photography class.  Order 20, ECF No. 92.  Plaintiff's proposed strip search class was not certified because it "encompasse[d] members whose claims invoke different questions of law and fact, and different claims and defenses, from Plaintiff's claim."  *Id.* at 25.  Therefore, only Plaintiff's individual

strip search claims remain. Finally, Plaintiff's cross-gender photography subclass would have consisted of those members of the photography subclass who were photographed by corrections officials of the opposite gender. Plaintiff has raised arguments in her motion for summary judgment and opposition to Defendant's motion for summary judgment that relate to her purported cross-gender photography subclass and claims. The Court previously found, however, that "[n]othing in the operative complaint puts [Defendant] on notice that Plaintiff is challenging, on behalf of a class, [Defendant's] practice of allegedly permitting a male ID Tech to photograph the private tattoos of female detainees." Order 7, ECF No. 92. The Court denied Plaintiff's motion to certify a cross-gender photography subclass; therefore, claims on behalf of this subclass are not a part of this litigation. The Court will not address Plaintiff's arguments in support of this claim.

## II. FACTUAL BACKGROUND

The general facts of this case that are not in dispute were laid out in the Court's order on class certification, ECF No. 92, and are repeated here as a starting point.

On June 29, 2012, Plaintiff Kristen McDonald was arrested for disorderly conduct (a fourth-degree misdemeanor). Plaintiff was transported to one of the County's two local correctional facilities, Jackson Pike. Jackson Pike typically houses female detainees, while the second facility (Corrections Center One)

typically houses male detainees. Both facilities receive individuals charged with a range of violations, from serious felony offenses to minor misdemeanors and city code violations.

Upon admittance to Jackson Pike, Plaintiff was subject to the institution's "change-out" procedure, which required Plaintiff to strip to her underwear in front of a Franklin County Corrections Deputy. The Deputy visually inspected Plaintiff to determine if she had contraband on her person. Plaintiff was also required to remove her underwire brassiere and piercings from her breasts while being watched by a corrections officer, at which point Plaintiff received a Jackson Pike uniform. Plaintiff does not allege or assert that the Deputy or other County personnel touched her at any point.[2]

After Plaintiff underwent this visual inspection and change of clothing, she was directed to the identification room by a County Identification Technician ("ID Tech"). Plaintiff was asked whether she had any tattoos, and after she responded that she did, including tattoos on her genitals, her tattoos were photographed. Plaintiff has testified that the photographer was a male, Michael

---

[2] Plaintiff refers to this process as a strip search while Defendant typically refers to it as a "change out" and states that it "is not actually a strip search, [but involved] only visual observation in private in a manner that minimizes the intrusion of privacy . . . ." Def. Mot. Summ. J. 20, ECF No. 162. The constitutionality of the search does not depend on the terminology used, so this exercise in semantics is of little value. As the Supreme Court noted in *Florence*, the term "strip search" is "imprecise" and can cover a wide range of activities from visual inspection from a distance to more intrusive or close inspections. *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 325 (2012). Given the Supreme Court's use of the term, this opinion will at times refer to the procedure utilized by Defendant as a strip search.

Cunningham.  Plaintiff has also testified that the doorway to the identification room was open when the photographs were taken.  Furthermore, the room is subject to video monitoring.  The photos are stored on a computer where they can be accessed by several individuals.  Plaintiff has not provided any evidence that anyone has inappropriately accessed or used the photographs.

After having her tattoos photographed, Plaintiff was transferred to a housing unit in the general population of the Jackson Pike facility.  She was released on bail the next day.  Two days later, Plaintiff was arraigned in the County Municipal Court, the charges against her were dismissed, and her record was sealed.

The remaining facts will be discussed as part of an analysis of the motions for summary judgment.

## II. SUMMARY JUDGMENT

### A. Standard of Review

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine issue of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence. *Pittman v. Cuyahoga Cty. Dep't of Children and Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 640 F.3d at 723 (quoting *Anderson*, 477 U.S. at 251–52).

Here, with respect to the photography class claims, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted

summary judgment on the other motion.  In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).  "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record."  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir. 1985)).  The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation.  *Taft Broad.*, 929 F.2d at 248.

## B. Defendant is Sui Juris

As a preliminary matter, Defendant makes a brief argument that it is not sui juris, opining that it "is no more a cognizable legal entity than the Franklin County Sheriff's Office . . . or the building known as Franklin County Corrections Center II."  Def. Mot. Summ. J. 18–19, ECF No. 162.  As Plaintiff points out in its memorandum in opposition, however, this Court has previously rejected this argument in the context of *Monell* claims against a county government.  Pl. Memo in Opp. 19, ECF No. 169 (citing *Stack v. Karnes*, 750 F. Supp. 2d 892, 899 (S.D. Ohio 2010)).  Judge Frost's detailed analysis in *Karnes* is sound and

does not bear repeating.  Plaintiff is permitted to bring her *Monell* claims against Defendant.  It appears Defendant concedes as much given that it did not include a defense of this argument in its reply in support of its motion for summary judgment.

### C. Standard for Fourth Amendment Claims for Pretrial Detainees

Both the Supreme Court and the Sixth Circuit have issued a number of opinions evaluating the Fourth Amendment rights of pretrial detainees.  While "there is no mechanical way to determine whether intrusions on an inmate's privacy are reasonable," *Florence*, 566 U.S. at 327 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)), prior decisions have provided both general guidance for how to evaluate such claims as well as a number of examples providing points of comparison when evaluating corrections policies.

As an initial matter, convicted prisoners, or pretrial detainees as in this case, "do not forfeit all constitutional protections by reasons of their conviction and confinement in prison." *Bell*, 441 U.S. at 545.  These rights include "the Fourth Amendment's guarantee of 'reasonable expectations of privacy.'" *Williams v. City of Cleveland*, 771 F.3d 945, 950 (6th Cir. 2014) (quoting *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013)).  However, that "does not mean that these rights are not subject to restrictions and limitations." *Bell*, 441 U.S. at 545.  "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require

limitation or retraction of the retained constitutional rights of . . . pretrial detainees." *Bell*, 441 U.S. at 546.

Because "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 548.

Therefore, even when a correctional facility policy infringes on a constitutional guarantee, "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547. In other words, "The need for a particular search must be balanced against the resulting invasion of personal rights." *Florence*, 566 U.S. at 327 (citing *Bell* generally). In order to conduct this balancing test, the Court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

"*Florence* does not stand for the proposition that every search conducted pursuant to a jail's uniformly applicable search policy is impregnable from attack

on that basis alone." *Williams*, 771 F.3d at 951. Strip searches are "a particularly extreme invasion" of Fourth Amendment rights, and they "may be unreasonable by virtue of the way in which [they are] conducted." *Id.* at 951–52. "Any given search or seizure of a detainee may not arbitrarily or needlessly encroach upon the detainee's privacy rights but must instead be 'reasonably related to legitimate penological interests.'" *Williams*, 771 F.3d at 950 (quoting *Stoudemire*, 705 F.3d at 572). In *Williams*, for example, the jail's method of searching prisoners (arrestees were fully disrobed in front of a correctional officer and sprayed on their naked body, including their exposed genitals, with a delousing solution from a pressurized metal canister) was such a "significant incursion into plaintiffs' privacy rights" that the Sixth Circuit found "the jail's need to perform the searches in [that] particular manner must be unusually dire before it can outbalance the affront to plaintiffs' privacy." *Id.* at 954.

If there is no "readily available alternative" to the correctional facility's practice, it is likely that the policy is "reasonably related to its legitimate penological interests." *Id.* at 950. However, an easy alternative to the policy "that fully accommodate[s] the prisoner's rights at *de minimis* cost to valid penological interests" suggests the facility's choice to implement that policy does not outweigh the constitutional burden imposed on its detainees. *Id.*

### D. Plaintiff's Individual Strip Search Claim

The Supreme Court recently had the opportunity to review the constitutionality of a strip search policy that was applied to pretrial detainees in *Florence*. This Court previously summarized *Florence* as follows when ruling on Plaintiff's motion to certify class claims:

> In *Florence*, the plaintiff was arrested for non-felony offense. The plaintiff was taken to two different correctional facilities, where he was required to remove his clothing while officers looked for contraband. "This policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history." After each search, the plaintiff was admitted to the facility's general population. The day after arriving at the second facility, the plaintiff was released and the charges against him were dismissed.
>
> The plaintiff sued on behalf of a class of individuals charged with nonindictable offenses who were directed to strip, prior to entering the facility's general population, without suspicion that they were concealing contraband.
>
> The Supreme Court found the strip-search policy constitutional. After acknowledging that "[p]ersons arrested for minor offenses may be among the detainees processed at these facilities," the Court stated: "The admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself. . . This puts the entire facility, including detainees being held for a brief term for a minor offense, at risk." The Court went on to hold that strip searches of detainees arrested for minor offenses who—like Plaintiff in this case—were admitted into the facility's general population, even without reasonable suspicion that the individual being searched was carrying contraband, were constitutional as a matter of law.
>
> *Florence* appears to dispose of Plaintiff's claim, but for one issue. The *Florence* Court left open, although it did not define, the possibility of a limited exception to its holding. In a concurring

opinion, Justice Alito (whose vote was needed to achieve the 5–4 majority), stated:

> Most of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate. In some cases, the charges are dropped. In others, arrestees are released either on their own recognizance or on minimal bail. **For these persons, admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible.**

(Alito, J., concurring). Justice Kennedy's majority opinion acknowledged the potential exception:

> This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees. . . . The circumstances before the Court . . . do not present the opportunity to consider a narrow exception of the sort Justice ALITO describes . . . which might restrict **whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of search at issue here.**

. . . . .

*Florence*, therefore, substantially impacts the scope of Plaintiff's claim. The focus of Plaintiff's claim is not whether the County's policy of strip searching misdemeanants is constitutional; the focus is whether the County's policy of admitting misdemeanant detainees into the general jail population is constitutional. Relevant facts include the reasons the County admits misdemeanants into its general population, and whether "an alternative procedure is feasible." (Alito, J., concurring).

> Viewed under this lens, Plaintiff's strip search claim can be summarized as follows: the County's policy of admitting pre-arraignment misdemeanants into Jackson Pike's general population (with the concomitant humiliation of a strip search) is unreasonable because an alternative procedure—holding such detainees in the facility's "booking area" until their arraignments—is feasible.

Op. & Order 21–23, ECF No. 92 (internal citations omitted and emphasis added).

After having the issue framed by the Court in its prior order, Plaintiff has failed to identify sufficient facts with citation to the record in her moving papers to demonstrate the feasibility of an alternative procedure for admitting pre-arraignment misdemeanants. Therefore, summary judgment against Plaintiff on her strip search claim is appropriate.[3]

Defendant has pointed to the following record evidence regarding the necessity of admitting all detainees to the general population and the availability of feasible alternatives. There is no intake center at Jackson Pike. Stobart Dep. 101, ECF No. 39. Approximately 35,000 detainees are brought into the custody of the Franklin County Sheriff's Department each year, which could include either

---

[3] The citation to facts actually in the record is critical. As an example of where Plaintiff has failed to meet this standard, in her opposition to Defendant's motion for summary judgment, Plaintiff "respectfully suggest[s] that the Court can take judicial notice of the fact that [identifying information necessary to post bail] can be immediately inputted into a computer upon a misdemeanor detainee entering the custody of the Jackson Pike facility, and the detainee can wait a few minutes in a holding cell until they can post bail and be released." Pl. Memo in Opp. 1, ECF No. 169. This assertion does not involve a fact "generally known" in this jurisdiction or "accurately and readily determined from sources whose accuracy cannot reasonably be questioned" as required by Fed. R. Evid. 201(b). The Court, therefore, cannot take judicial notice of this assertion that goes right to the heart of Plaintiff's strip search claim. While Plaintiff did introduce some evidence related to this topic, she cannot rely on sweeping statements or requests for judicial notice as an alternative to citing to evidence in the record to prove her claim.

Case No. 2:15-cv-2763                                                                                     Page 13 of 27

Jackson Pike or Corrections Center One. *Id.* at 46. At Jackson Pike, there are eleven holding cells, and they are used on an almost continual basis. Stobart Aff. ¶ 16, ECF No. 162-2. The holding cells at Jackson Pike only contain benches, not beds. Metz Dep. 72, ECF No. 42. Defendant uses the holding cells for a variety of purposes, including housing mentally ill inmates on safety watch, intoxicated inmates, and inmates awaiting transfer to other facilities. Def. Mot. for Summ. J. 10, ECF No. 162. "[S]afety watches can last several days and multiple inmates can be on a safety watch simultaneously, with each inmate in their own individual holding cell." Stobart Aff. ¶ 9, ECF No. 162-2. Chief Deputy Mike Flynn, one of Defendant's 30(b)(6) witnesses, testified that they lack the physical space "to hold everybody in booking until their bond papers and their bond is granted." Flynn Dep. 39–40, ECF No. 41.

In order for a detainee to be released on bail, she must post bond with the Franklin County Municipal Court Clerk (the "Clerk"). Stobart Dep. 96, ECF No. 39. Even if bond is posted when a detainee first comes into Jackson Pike, it could take up to eight hours for the process to be completed. *Id.* Arraignments take place at 9:00 a.m., Monday through Saturday, for those detainees unable or not permitted to post bond. Pendy Aff. ¶ 4, ECF No. 162-1. Franklin County Municipal Court policy requires an arrestee to be slated into Jackson Pike no later than 11:00 p.m. the night before in order to be arraigned the next day. *Id.* at

¶ 5. In order for an arrestee to post bail, the Clerk must have an inmate number from the Sheriff's Office. *Id.* at ¶ 7.

At the time Plaintiff was arrested, the Ohio Administrative Code required prisoners confined for more than eight hours to be assigned a bed. OAC § 5120:1-8-01(A)(12)(a).[4]

Plaintiff, for her part, added the following facts from the record related to her strip search claim. The Jackson Pike facility would typically intake approximately fifteen women per night shift (11:00 p.m. to 7:00 a.m.). Metz Dep. 65, ECF No. 42. On a Friday night, that number might be in the thirties.[5] *Id.* The communal cells at Jackson Pike could hold approximately ninety people at one time comfortably. *Id.* at 72. Plaintiff's expert, Arthur Wallenstein, opined that "[t]here is no reason that newly arrived female arrestees cannot be held safely and efficiently in an area separate from those fully arraigned and ordered incarcerated in the general population, especially given that the booking area at Jackson Pike has two large holding cells that can house 80 detainees." Wallenstein Rep. 9–10, ECF No. 174-1.[6]

---

[4] This rule was subsequently amended. The current rule prohibits inmates from being "confined in the reception area for more than twelve hours except when security, health and mental health concerns are being addressed." OAC § 5120:1-8-01(A)(9).

[5] This is one example of where the factual record was underdeveloped. Plaintiff could have elicited testimony or cited documents to show how many detainees were processed in Jackson Pike on the same night as her to better illustrate how easy it would have been to house her separately prior to her posting bond, but this evidence was not cited to in the record.

[6] Defendant moved to strike or exclude the report and declaration of Mr. Wallenstein. ECF No. 172. The Court need not consider this motion on its merits. With respect to

Someone can go into the Clerk's office and pay bail twenty-four hours a day. Pendy Dep. 20, ECF No. 159. In order for someone to be permitted to post bail, though, the Clerk's office must have received a prisoner number, the name of the detainee, her address, the charges, case number, and a future court date. *Id.* at 21. This information is gathered as part of the "slating" process, which is controlled by the Sheriff's Department.[7] *Id.* at 63. The decision on when to slate a detainee during the booking process (i.e., initially upon arrival at the jail or as part of the process of admitting a detainee into the general population) is also in the control of the Sheriff's Department. *Id.* Most of the information the Clerk's office needs to bail out a detainee is in a form filled out by the arresting officer. *Id.* at 59. The only additional information that is needed is a slate number from the Sheriff's Department and a court date which is provided by the Clerk's office. *Id.* at 58–60. Once the Clerk's office receives that information, bail can be set within a matter of minutes. *Id.* at 60.

Plaintiff was charged with a fourth degree misdemeanor, meaning she could have bailed herself out for as little as $79. *Id.* at 17. Plaintiff had her

---

Plaintiff's strip search claim, the Court grants summary judgment for Defendant despite Mr. Wallenstein's opinion. The Court did not consider any of Mr. Wallenstein's opinions in its analysis of the photography class claim. Therefore, Defendant's motion to strike or exclude, ECF No. 172, is **DENIED** as **MOOT**. The Court will address the issues raised by Mr. Wallenstein's report in an upcoming status conference as discussed below.

[7] Slating simply means entering a detainee into the jail's computer system. Stobart Dep. 69, ECF No. 39.

Case No. 2:15-cv-2763

driver's license and credit cards sufficient to post bail of at least $200 on the night she was arrested.  McDonald Aff. 1, ECF No. 169-4.

The evidence cited by Plaintiff raises questions of fact regarding how long it takes for a detainee brought into Jackson Pike to obtain bail.  It also demonstrates that there are holding cells that are large enough, generally speaking, to fit the number of detainees who are brought in during a typical shift. However, Plaintiff has not presented any evidence to refute the substantial evidence presented by Defendant that the holding cells at Jackson Pike are needed for purposes other than just housing detainees who are attempting to post bail.  Plaintiff has not proffered any evidence suggesting that, for instance, mentally ill inmates or those who are awaiting transfer to another facility could be housed somewhere else within Jackson Pike.  Plaintiff has also not pointed to any evidence demonstrating that the holding cells were available for use to house arrestees awaiting bail on the specific night she was arrested.

Plaintiff has raised arguments that appeal to the Court's sense of justice and raise concerns as to the propriety, and perhaps constitutionality, of Defendant's blanket policy of admitting all arrestees into the general population of Jackson Pike.  The Court is particularly concerned that it appears Defendant never gives arrestees an opportunity to post bail prior to admitting them to the general population, even if the holding cells are empty.  However, without being presented with facts that allow the Court to address these concerns, it will not

Case No. 2:15-cv-2763                                    Page 17 of 27

override in this lawsuit the "wide-ranging deference" Defendant is entitled to in adopting policies and practices that it believes "are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547. Plaintiff was obligated to introduce *"substantial evidence"* that Defendant's policy of admitting all detainees to the general population was an exaggerated response to the problem of housing detainees, including those who have not yet posted bail, those on suicide watch, those awaiting transfer, etc., *id.* at 548, and she has not met that obligation.

Because Plaintiff failed to demonstrate that Defendant's solution was an exaggerated response, Plaintiff failed to demonstrate that her Fourth Amendment rights were violated. This is particularly so given that Defendant chose to utilize a less invasive search on Plaintiff than some corrections facilities use (i.e., not forcing Plaintiff to remove her underwear and only requiring her to remove her brassiere because the underwire is considered contraband). *Compare* Defendant's policies with the policies in *Florence*, 566 U.S. at 323 (arrestees required to fully disrobe, shower with a delousing agent, and undergo inspection by officer that included arrestee lifting his genitals), and *Williams*, 771 F.3d at 948 (arrestees were fully disrobed in front of a correctional officer and sprayed on their naked body, including their exposed genitals, with a delousing solution from a pressurized metal canister).

Therefore, with respect to Plaintiff's individual strip search claim, Defendant's motion for summary judgment is **GRANTED**.[8] To be clear, however, the Court is not making a blanket ruling that Defendant's policy of admitting every arrestee into the general population of Jackson Pike is constitutional in every case. Instead, the Court only finds that Plaintiff failed to present sufficient facts to survive summary judgment on her individual claim.

### E. Photography Class Claims

Because Plaintiff failed to demonstrate that Defendant's policy of admitting all arrestees into the general population of Jackson Pike was unreasonable, the Court must determine if Defendant's photographing of tattoos in the private areas of detainees is nevertheless unconstitutional.

Following *Bell v. Wolfish*, the Court begins by analyzing the scope of the particular intrusion. *Id.* at 559. As discussed above, the Sixth Circuit has found that strip searches are a particularly extreme invasion of Fourth Amendment rights, *Williams*, 771 F.3d at 951, even without photographing the private areas of the detainee. In the Court's view, the scope of the intrusion is magnified over a

---

[8] Defendant also argues that Plaintiff asserts an independent claim under the Fourteenth Amendment's right to privacy, which fails as a matter of law. Def. Mot. Summ. J. 33–34, ECF No. 162. Upon review of the Amended Complaint, the Court does not agree that Plaintiff has asserted any separate claim based upon the Fourteenth Amendment. Rather, Plaintiff asserted that "the right to privacy is protected by the Fourteenth Amendment and is also an independent right with other constitutional underpinnings." Am. Compl. ¶ 48, ECF No. 20. Plaintiff did not assert a separate cause of action based on the Fourteenth Amendment and did not address such a claim in her moving papers. Therefore, no separate claim based on the Fourteenth Amendment needs to be dismissed, and the Court considers the cross motions for summary judgment as briefed.

Case No. 2:15-cv-2763

normal strip search by the taking of a photograph. A photograph is a permanent (at least until deleted) record of the indignity suffered by the detainee. A detainee could fairly wonder what became of the photograph, who has viewed it, and whether any inappropriate use was ever made of the photograph. It is not relevant whether such a subsequent use, appropriate or inappropriate, is ever made of the photograph. The simple fact that the record was made results in an increased intrusion.

The Court next addresses the place and manner in which the photographs were taken. *Bell*, 441 U.S. at 559. Defendant processes one inmate through the ID bureau at a time. Def. Resp. to Mot. for Summ. J. 1, ECF No. 167; Plaintiff's Dep. 89, ECF No. 38. Photographs of tattoos are taken in a small room. The parties dispute whether the door to that room is always closed when inmates have to remove their clothes. The parties also dispute whether the individual who photographs the tattoos is always the same gender as the inmate.

The Court must next consider the justification for initiating the search. *Bell*, 441 U.S. at 559. Defendant contends that detainee tattoos, including those on private areas, "are photographed for identification purposes and for safety and security reasons." Def. Resp. 4, ECF No. 167. Defendant's expert, Captain Sean Stewart, summarized the reasons given by Franklin County officials in his expert report as follows:

> "It was two fold. It was for gang affiliation, and for identification purposes." (Beth Owens Deposition Page 74 lines 17 and 18).

"We had a – The reason it started was we didn't take pictures of tattoos at all before, and there was a serial killer in Columbus previously who had been abducting prostitutes and dropping them off. And in those cases, their tattoos were the only way that they were able to identify a lot of them". (Michael Cunningham Deposition Page 19 lines 1 thru 7).

"For identification purposes"- "I was told – Like you said, there was a serial killer killing apparently prostitutes, and they were brought in to identify the body. So they put in for the fact for identification purposes, to go ahead and start photographing all the detainees". (Claudia Barajas Deposition Page 46 line21 and Page 47 lines 6 thru 11).

"Again, it's for the identification purpose of identifying people. We use scars, marks, and tattoos as identifying marks when identifying people". – "Again, because we use that as an investigative tool. Tattoos are often used in identifying people on the street. They are often used in identifying people who have been murdered. They are often used in identifying people who have been in serious car accidents and are disfigured beyond recognition, burned. There's all kinds of reasons to have scars, marks, and tattoos clearly identified on people". (Geoffrey Stobart Deposition Page 171 lines 21 thru 24 and Page 172 lines 6 thru 16).

Stewart Report 19, ECF No. 162-3.

As summarized by Defendant's expert, Michael Cunningham and Claudia Barajas, two ID Techs who took the photos at issue, testified that the purpose of photographing the tattoos was identification of victims in the future and did not mention gang affiliation or security as a justification for the photographs.

Beth Owens, the Manager of the Identification Unit for the Franklin County Sheriff's Office, testified that the photographs could be used for both gang affiliation or identification purposes. The first time she was asked in her

deposition why tattoos on or near genitals would need to be photographed, Ms. Owens said "There are times when investigative officers - - investigators are looking for certain tattoos in certain places for victims." Owens Dep. 47, ECF No. 40. Later, after she added gang affiliation as a reason for photographing tattoos, Ms. Owens was asked why a photograph would need to be taken of a tattoo that was clearly not gang related, like "a butterfly someone has on their buttocks." *Id.* at 79. Ms. Owens responded that it would not be for identifying gang activity, "it would be for identification purposes." Owens Dep. 79–80, ECF No. 40.

Geoffrey Stobart, Chief Deputy in charge of Corrections for the Franklin County Sheriff's Office, also testified that the photographs could be used for gang affiliation or identification purposes. In addition to the testimony cited above, Chief Stobart stated at a different point in his deposition that photographs of tattoos were taken to "identify[] potential gang tattoos and threats that could be considered in a classification of the inmates." Stobart Dep. 142, ECF No. 39.

Defendant's expert, Captain Stewart, opines generically in his report that "[m]any facilities across the country photograph the tattoos of incoming detainees," Stewart Dep. 19, ECF No. 162-3, but he does not say that these facilities take photographs of tattoos in private areas. Captain Stewart states that the photographs can be "used as a classification and identification tool." *Id.* Captain Stewart also opines that photographing the tattoos is the "least intrusive and most reliable" way to document these tattoos, because detainees would

have to be exposed for longer periods of time if ID Techs attempted to document these tattoos in writing. *Id.* at 20. He asserts that ID Techs cannot rely on the detainees' description of the tattoo because, in his experience, "when asking a detainee what tattoos they have and where they are placed on their body, the detainee is likely to be misleading with the information provided." *Id.*

The Court finds that there is a genuine issue of material fact as to whether Defendant's photographing of tattoos on private areas of detainees is an exaggerated response to the security risk posed by gang-affiliated inmates being housed together in the jail's general population.

First, Defendant did not introduce evidence explaining how photographs of tattoos generally, let alone photographs of tattoos on private areas, were examined at a later time by Defendant to ensure that gang classifications for housing purposes were properly made. The evidence did not demonstrate how the photograph itself, as opposed to the initial review and classification of the tattoo, aided in in determining whether a tattoo signified gang affiliation. Ms. Owens testified generally that the photographs were necessary "[b]ecause [her] ID staff were not gang investigators," Owens Dep. 79, ECF No. 40, but Defendant did not cite evidence presenting how photographing the tattoos fixed that problem.

There is conflicting evidence on the actual reason Defendant takes the tattoo photographs. As discussed above, Defendant's employees cite two

different reasons for taking the photographs: gang affiliation and identification for future victims and perpetrators.  Both Cunningham and Barajas, however, testified that the policy of photographing all tattoos was put into place after tattoos were useful in identifying victims of a serial killer, not as a response to gang violence.  Stewart Report 19, ECF No. 162-3.

Second, there is conflicting evidence as to whether Defendant views there to be a risk of gang-affiliated tattoos on private areas.  Chief Stobart testified that he has "heard" of gang tattoos on breasts and genitals.  Stobart Dep. 144, ECF No. 39.  However, Defendant did not cite to any specific instance where gang tattoos were found on private areas and, as importantly, Defendant did not routinely inspect the private areas of detainees to look for gang-affiliated tattoos.  Instead, ID Techs relied on detainees to admit they have tattoos in order to determine they needed to be photographed.  See, e.g., Cunningham Dep. 41, ECF No. 44-1.  Defendant, therefore, states on the one hand that tattoos on private areas present a serious risk, while on the other hand, it fails to even inspect for tattoos unless a detainee admits to having one.  This is particularly questionable given that Defendant's own expert opined that inmates typically lie about the presence of such tattoos.  See Stewart Dep. 20, ECF No. 162-3.

Third, Defendant has not cited any evidence that Defendant's tattoo photography policy was consistent with any other jail's policy for admitting new detainees.  As stated above, Defendant's expert testified generally that other

corrections facilities photograph tattoos, but he did not identify any facility that takes these photographs when the tattoo is located on a detainee's private areas. The Court has not found any case law involving such invasive photography policies. The lack of any evidence in the record or case law suggesting that other jurisdictions follow this same practice raises questions as to whether photographing tattoos on private areas is a reasonable response to the threat posed by gang-affiliated tattoos.

Defendant cites one analogous case in support of its policy.[9] In *Schmidt v. City of Bella Villa,* the Eighth Circuit Court of Appeals found that an arrestee's Fourth Amendment rights were not violated when she was required to unzip her pants and fold them inward in order to have a tattoo near her hipbone photographed. 557 F.3d 564, 568, 572, 574 (8th Cir. 2009). The court stated that "[t]here are legitimate law-enforcement purposes served by photographing the tattoos of an arrestee for use in identification." *Id.* at 572. In that case, the police had learned that the arrestee had given false identification information during her arrest, including a false name, date of birth, and social security number. *Id.* at 573. The court found that taking the photograph was justified to use the tattoo as an "identifying mark." *Id.*

The Court considers *Schmidt* as persuasive authority but finds it to be

---

[9] Defendant also cites to *Armstrong v. Jackson*, No. 3:06-cv-87, 2009 WL 585853 **15–16 (S.D. Ohio March 6, 2009). However, that case involved a tattoo on an arrestee's stomach that was photographed for purposes of identifying whether he was the perpetrator in a particular case. Neither the reason for taking the tattoo nor the location of the tattoo is at all analogous to this case.

Case No. 2:15-cv-2763 Page 25 of 27

distinguishable and therefore departs from the reasoning of the Eighth Circuit in some respects. First, the arrestee in *Schmidt* was not required (due to the location of the tattoo) to completely expose her genitalia or another private area. Instead, she only needed to roll down her pants to the extent necessary to expose the tattoo near her hipbone. *Id.* This is less invasive than the photographs taken by Defendant in this case. Second, in *Schmidt* there is no indication that photographing tattoos was done in all cases; rather, it appears that it was done in that case only because the plaintiff had given a false identification to the police. The *Schmidt* court discussed the plaintiff's use of a false identification when evaluating the justification for the search. *See id.* at 573.

The second distinction is critical in the Court's view. Schmidt's provision of false identifying information provided the police in that case with an immediate need to collect further identifying information. The court indicated in that case that photographing the tattoo was part of the police's interview of Schmidt regarding her identity. *Id.* at 567.[10]

Additionally, Plaintiff has failed to point to substantial evidence demonstrating there is no genuine issue of material fact as to whether

---

[10] While it is true that the Supreme Court in *Florence*, decided after *Schmidt*, found that searches could be performed on a uniform basis and not only when suspicion existed with respect to the particular detainee, broadly applied searches were necessary in *Florence* to prevent the problem of contraband, including drugs and weapons, entering jails. *Id.* at 327, 338. "[D]eterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions." *Id.* at 327–28. This same security justification is not present when it comes to the photographing of detainee's tattoos for identification purposes.

Case No. 2:15-cv-2763                                                    Page 26 of 27

Defendant's tattoo photography policy was an exaggerated response to its interested in maintaining security at Jackson Pike. While the evidence cited by Defendant was insufficient to entitle it to summary judgment on the photography class claims, it nevertheless does raise a genuine issue of material fact.

Based on the foregoing, the Court finds that there are genuine issues of material facts as to whether Defendant's policy of photographing all tattoos, including those located on the "breasts, hypogastric region, genitals, and/or buttocks," violates the Fourth Amendment to the United States Constitution. Therefore, both Plaintiff's and Defendant's motions for summary judgment on the photography class claims are **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment, ECF No. 163 is **DENIED**, Defendant's motion for summary judgment, ECF No. 162, is **GRANTED IN PART** and **DENIED IN PART**, and Defendant's motion to strike, ECF No. 172, is **DENIED AS MOOT**.

The Court will hold an in-person status conference to discuss the next steps in this case on Thursday April 19, 2018, at 2:00 p.m.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**