UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Kristen McDonald,
individually and on behalf of
a class of others similarly situated

        Plaintiffs,

v.

Franklin County, Ohio,

        Defendant.

Case No. 2:13-cv-503

Judge Michael H. Watson

Magistrate Judge Vascura

## OPINION AND ORDER

Defendant Franklin County, Ohio ("Defendant") moves for summary judgment against Plaintiff on her remaining photography class claims. Mot. Summ. J., ECF No. 198. For the following reasons, Defendant's motion is **DENIED.**[1]

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

Plaintiff filed her Complaint on May 23, 2013, and subsequently amended the Complaint on September 30, 2013. As discussed in the Court's prior Opinion

---

[1] Because this opinion and order deals with an issue that was previously briefed and decided by the Court based on a more limited set of facts, the bulk of this opinion's procedural background, facts, and legal standards are simply repeated from the Court's prior Opinion and Order granting in part and denying in part Defendant's first motion for summary judgment, ECF No. 187.

and Order on the parties' motions for summary judgment, ECF No. 187, the Amended Complaint asserts that Defendant's procedures for admitting detainees to the Franklin County Corrections Center at Jackson Pike ("Jackson Pike"), which typically houses female detainees, are unconstitutional under the Fourth and Fourteenth Amendments. After the Court granted summary judgment to Defendant on certain claims in its prior Opinion and Order, ECF No. 187, Plaintiff's only remaining claim relates to Defendant's policy of photographing all tattoos on detainees, including tattoos on a detainee's private areas.

The Court previously certified a photography class pursuant to Rule 23(b)(2) and Rule 23(b)(3), permitting Plaintiff to seek both injunctive and monetary relief on behalf of the photography class. Order 20, ECF No. 92.

In its prior Opinion and Order, the Court denied Defendant's motion for summary judgment on the photography class claims, finding "that there are genuine issues of material facts as to whether Defendant's policy of photographing all tattoos, including those located on the 'breasts, hypogastric region, genitals, and/or buttocks,' violates the Fourth Amendment to the United States Constitution." Op. & Order 27, ECF No. 187.

Based on the briefing presented for the prior round of summary judgment, the Court was concerned that it had not been presented with all relevant facts necessary to rule on Plaintiff's photography class claims. Therefore, after ruling on the motions for summary judgment, the Court held a status conference on

April 26, 2018. At that status conference, the Court ordered supplemental discovery to address the following questions from the Court:

> What does Defendant do with the tattoo photographs that are taken? If the photographs have ever been subsequently reviewed, what purposes have been served by the review? Are the photographs reviewed for gang affiliation/classification prior to admitting detainees to the general population of Jackson Pike? Are they subsequently reviewed for gang affiliation/classification after detainees are admitted to the general population?
> Do any other facilities photograph tattoos on private areas? If so, is it only for felony arrestees or is it also done for misdemeanor arrestees?

Order, ECF No. 189. The Court also gave the parties an opportunity to file renewed motions for summary judgment, *id.* at 2, which Defendant opted to do, ECF No. 198.

## B. Factual Background

The general facts of this case have been laid out in the Court's prior orders and are repeated here as a starting point.

On June 29, 2012, Plaintiff Kristen McDonald was arrested for disorderly conduct (a fourth-degree misdemeanor). Plaintiff was transported to Jackson Pike, one of the County's two local correctional facilities. Jackson Pike typically houses female detainees, while the second facility (Corrections Center One) typically houses male detainees. Both facilities receive individuals charged with a range of violations, from serious felony offenses to minor misdemeanors and city code violations.

Upon admittance to Jackson Pike, Plaintiff was subject to the institution's "change-out" procedure, which required Plaintiff to strip to her underwear in front of a Franklin County Corrections Deputy. The Deputy visually inspected Plaintiff to determine if she had contraband on her person. Plaintiff was also required to remove her underwire brassiere and piercings from her breasts while being watched by a corrections officer, at which point Plaintiff received a Jackson Pike uniform. Plaintiff does not allege or assert that the Deputy or other County personnel touched her at any point.

After Plaintiff underwent this visual inspection and change of clothing, she was directed to the identification room by a County Identification Technician ("ID Tech"). Plaintiff was asked whether she had any tattoos, and after she responded that she did, including tattoos on her genitals, her tattoos were photographed. Plaintiff has testified that the photographer was a male, Michael Cunningham. Plaintiff has also testified that the doorway to the identification room was open when the photographs were taken. Furthermore, the room is subject to video monitoring. The photos are stored on a computer where they can be accessed by several individuals. Plaintiff has not provided any evidence that anyone has inappropriately accessed or used the photographs.

After having her tattoos photographed, Plaintiff was transferred to a housing unit in the general population of the Jackson Pike facility. She was released on bail the next day. Two days later, Plaintiff was arraigned in the

County Municipal Court, the charges against her were dismissed, and her record was sealed.

The remaining facts, including the facts revealed during the supplemental discovery period, will be discussed as part of the analysis of Defendant's motion for summary judgment.

## II. STANDARD

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine issue of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence. *Pittman v. Cuyahoga Cty. Dep't of Children and Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). Summary judgment will not lie if the dispute about

a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 640 F.3d at 723 (quoting *Anderson*, 477 U.S. at 251–52).

## III. ANALYSIS

### A. Standard for Fourth Amendment Claims for Pretrial Detainees

Both the Supreme Court and the Sixth Circuit have issued a number of opinions evaluating the Fourth Amendment rights of pretrial detainees. While "there is no mechanical way to determine whether intrusions on an inmate's privacy are reasonable," *Florence*, 566 U.S. 318, 327 (2012) (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)), prior decisions have provided both general guidance for how to evaluate such claims as well as a number of examples providing points of comparison when evaluating corrections policies.

As an initial matter, convicted prisoners, or pretrial detainees as in this case, "do not forfeit all constitutional protections by reasons of their conviction and confinement in prison." *Bell*, 441 U.S. at 545. These rights include "the Fourth Amendment's guarantee of 'reasonable expectations of privacy.'" *Williams v. City of Cleveland*, 771 F.3d 945, 950 (6th Cir. 2014) (quoting

*Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013)). However, that "does not mean that these rights are not subject to restrictions and limitations." *Bell*, 441 U.S. at 545. "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of . . . pretrial detainees." *Bell*, 441 U.S. at 546.

Because "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 548.

Therefore, even when a correctional facility policy infringes on a constitutional guarantee, "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547. In other words, "The need for a particular search must be balanced against the resulting invasion of personal rights." *Florence*, 566 U.S. at 327 (citing *Bell* generally). In order to conduct this balancing test, the Court "must consider the scope of the particular intrusion, the manner in which it is

conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

"*Florence* does not stand for the proposition that every search conducted pursuant to a jail's uniformly applicable search policy is impregnable from attack on that basis alone." *Williams*, 771 F.3d at 951. Strip searches are "a particularly extreme invasion" of Fourth Amendment rights, and they "may be unreasonable by virtue of the way in which [they are] conducted." *Id.* at 951–52. "Any given search or seizure of a detainee may not arbitrarily or needlessly encroach upon the detainee's privacy rights but must instead be 'reasonably related to legitimate penological interests.'" *Williams*, 771 F.3d at 950 (quoting *Stoudemire*, 705 F.3d at 572). In *Williams*, for example, the jail's method of searching prisoners (arrestees were fully disrobed in front of a correctional officer and sprayed on their naked body, including their exposed genitals, with a delousing solution from a pressurized metal canister) was such a "significant incursion into plaintiffs' privacy rights" that the Sixth Circuit found "the jail's need to perform the searches in [that] particular manner must be unusually dire before it can outbalance the affront to plaintiffs' privacy." *Id.* at 954.

If there is no "readily available alternative" to the correctional facility's practice, it is likely that the policy is "reasonably related to its legitimate penological interests." *Id.* at 950. However, an easy alternative to the policy "that fully accommodate[s] the prisoner's rights at *de minimis* cost to valid

penological interests" suggests the facility's choice to implement that policy does not outweigh the constitutional burden imposed on its detainees. *Id.*

## B. Photography Class Claims

As explained above, the parties were granted additional discovery and permission to file a second motion for summary judgment on the photography class claims. The new evidence Defendant provided in its motion for summary judgment and Plaintiff provided in her response all goes to Defendant's justification for its tattoo photography policy. In its prior Opinion and Order, the Court found that Defendant had two justifications for photographing all tattoos on inmates—i.e. identification of gang affiliation and identification in future law enforcement cases, Op. & Order 20–23, ECF No. 187, and the Court questioned whether identification of gang affiliation was truly one of the purposes of the policy. Defendant addressed one of the Court's concerns by providing testimony indicating that Franklin County's jails have encountered at least one gang-related tattoo on an inmate's genitals (lightning bolts signifying the Aryan brotherhood).[2] Martin Dep. 31:6–20, ECF No. 196. While one tattoo found on an inmate's genitals seems to be a relatively rare occurrence, it does provide some evidence supporting Defendant's argument that gang-related tattoos in private areas could be a legitimate safety threat.

Defendant went on to address the Court's questions by presenting some

---

[2] There is no testimony that this identification was aided by a photograph of the tattoo.

Case No. 2:13-cv-503 Page 9 of 13

evidence that there are other jails that photograph tattoos in sensitive areas. *See* Mot. Summ. J. 17–19, ECF No. 198. Specifically, Defendant's expert, Captain Stewart, sent an inquiry to an email list from the National Jail Academy and the National Institute for Jail Operations asking whether those agencies photographed arrestees' tattoos on private areas, and whether such photographs were only taken for felons or also for misdemeanants. *Id.* at 17. Five institutions responded, and each of them indicated that they take photographs of tattoos on both felony and misdemeanor arrestees. Stewart Aff. 7, ECF No. 198-1. Only three of the facilities specified that they take photographs of the tattoos even if they are on a private area. One of these three indicated that they take the photographs in a "discrete [sic] manner"—but did not specify what that means—and another specifically stated that photographs taken of tattoos near private areas are taken by zooming in so the photograph depicts only the tattoo. *Id.* Defendant does not zoom in so that only the tattoo is depicted, as evidenced by the photograph taken of Plaintiff. Here again, Defendant's supplemental information provides limited evidence that there are some other facilities that follow a similar tattoo photography policy. It is unclear, however, how many facilities are on the email list Captain Stewart used and why all the other facilities chose not to respond. Defendant's evidence also reveals that at least one of the five responding facilities takes the photographs in a less intrusive manner.

Defendant's motion for summary judgment also added a new purported

penological interest for taking the photographs—protecting the health, safety, and welfare of inmates. In essence, Defendant argues that jail house tattoos can spread communicable diseases throughout the jail and Defendant has a duty to try to prevent them. Mot. Summ. J. 15–16, ECF No. 198. However, Defendant fails to provide any evidence that photographs of tattoos have ever been used in furtherance of this penological interest.

Plaintiff responds to Defendant's renewed motion for summary judgment first by arguing that "Defendant has not offered any evidence that these photographs are actually reviewed by anyone for gang affiliation. Resp. 8, ECF No. 208. Specifically, Plaintiff cites testimony from Mary Jane Martin, the Risk Manager for the Franklin County Sheriff, in which she agreed, "generally speaking," that tattoo photographs were not reviewed for gang classification purposes unless the ID tech recognized the tattoo to be a threat. Martin Dep. 66, ECF No. 196. There was no routine policy of reviewing the tattoo photographs to ensure that none of the tattoos were gang related. *Id.* at 69:17–24.[3] Defendant's expert, Captain Stewart, testified that jail personnel would not be "doing their job" if they took photographs of tattoos for gang classification but never subsequently reviewed the photographs. Stewart Dep. 149–50, ECF No. 195.

Plaintiff uses the Pima County Jail, the facility at which Captain Stewart

---

[3] Ms. Martin added testimony indicating that one of the purposes for taking the tattoo photographs is for use by outside law enforcement agencies. *See id.* at 71:6–11.

Case No. 2:13-cv-503　　　　　　　　　　　　　　　　　　　　　　　Page 11 of 13

works, as a point of comparison for how photographs could be used. Resp. 9, ECF No. 208. Captain Stewart testified that at the Pima County Jail all photographs of tattoos are reviewed by security personnel to determine whether the tattoo is gang related. Stewart Dep. 74, ECF No. 195. This is necessary because intake staff are not trained to identify gang tattoos, but the security personnel are. See id. at 79:16–18. Franklin County, on the other hand, does not have staff trained in gang tattoo identification review the photos as a matter of course. This was one of the Court's key concerns in its prior Opinion and Order, and additional discovery has not allayed the Court's concerns.

After a supplemental period of discovery and another round of briefing on summary judgment, the same genuine issues of material fact remain that the Court discussed in greater detail in its prior Opinion and Order. Op. & Order 23–25, ECF No. 187. While Defendant is entitled to "wide-ranging deference" in adopting its security policies, Bell, 441 U.S. at 547, this deference is not without limits. Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether Defendant exaggerated its response to the problem posed by gang-related tattoos. Indeed, both Plaintiff and Defendant have cited evidence that other facilities handle this same security threat in a far less intrusive fashion.

## IV. CONCLUSION

For the foregoing reasons, Defendant's renewed motion for summary judgment, ECF No. 198, is **DENIED**.  The Court will notice a telephonic status conference to discuss trial.

**IT IS SO ORDERED.**

*[Signature]*
**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**